IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

HERMAN L. HUTTON,                       *
                                        *
                Plaintiff,              *
vs.                                     *          No. 4:13-cv-00378-SWW
                                        *
                                        *
MAYOR DANNY MAYNARD, SR.,               *
Individually and as Mayor of the City of *
England, Arkansas; LENNY ABRAMS;        *
PEGGY BAKER; RICK DOUGLAS;              *
DEARL FRIZZELL; MARY GIVENS;            *
BILL NEWTON; JEREMY NUTZ;               *
DUDLY WEBB, JR.; and THE CITY OF        *
ENGLAND, ARKANSAS,                      *
                                        *
                Defendants.             *

<u>OPINION AND ORDER</u>

Herman L. Hutton, former Chief of Police for the City of England, Arkansas (the

City), brings this action against the City, Mayor Danny Maynard, Jr., and City Council

members Lenny Abrams, Peggy Baker, Rick Douglas, Dearl Frizzell, Mary Givens, Bill

Newton, Jeremy Nutz, and Dudly Webb, Jr., claiming he was terminated as Chief of

Police in retaliation for his desire to promote an African-American, in retaliation for his

preaching off duty as an ordained Baptist minister, and due to a desire to replace him with

someone younger.  Hutton brings his claims pursuant to Title VII of the Civil Rights Act

of 1964, as amended, 42 U.S.C. § 2000e *et seq*., the Age Discrimination in Employment

Act (ADEA), 29 U.S.C. § 621 *et seq*., and 42 U.S.C. §§ 1981, 1983.  Hutton also asserts a

state law claim of wrongful discharge.

Before the Court is defendants' motion for summary judgment [doc.#24].  Hutton has responded in opposition to defendants' motion and defendants have replied to Hutton's response.  For the reasons that follow, the Court grants defendants' motion for summary judgment on Hutton's federal claims and dismisses Hutton's state law claim of wrongful discharge without prejudice.

I.

Hutton, a white male, was hired as the City's Chief of Police on August 6, 2007.  Maynard terminated Hutton from that position on September 19, 2012.

Hutton states that "[d]uring 2009, I was called to minister and began serving as a Baptist preacher."  Hutton Aff. ¶ 5.[1]  When Hutton started preaching in 2009, Hutton went to Maynard and told him he was going to preach and Maynard supported him.  Hutton Depo. at 31, 52.  Hutton states he "served as a minister and preacher to area Baptist churches on his off days throughout his administration time," that he "was ordained with the knowledge and support of the Mayor and city officials," and that "[t]he Mayor and City Council all knew and respected the Plaintiff for his religious beliefs and, at no time, asked him to cease working as a minister on his off days."  Pl.'s Compl. ¶¶ 12, 21.

---

[1] In his response to defendants' statement of undisputed material facts, Hutton denies his own statement that he began preaching in 2009, stating that he "does not recall the exact year in which he began preaching but believes it may have been in 2009."  Pl.'s Resp. to Def.s' St. of Undisp. Mat. Facts, ¶ 5 [doc.#34].  In his complaint, Hutton states that "since July 2008, [he] served faithfully as an ordained minister of various churches in the area as a Baptist preacher." Pl.'s Compl. ¶ 19.

Some three years after he started preaching, Maynard informed Hutton by letter dated April 30, 2012, that he had received several negative comments from residents regarding a community meeting and that the people who spoke with him about it felt there was too much religious emphasis, with one person saying "it was more like a church service than a city meeting."  Maynard also expressed concern about a plaque on the wall of the Police Department entrance with the Ten Commandments and noted that Don Zimmerman, Executive Director of the Arkansas Municipal League, stated this was inappropriate and placed the City at risk for legal action.  Maynard concluded his letter to Hutton as follows:

> Based on my conversation with Don, I would ask the following: (1) Please do not schedule another community meeting unless the focus is completely on the city, (2) Please do not display any religious materials in areas of the Police Department which are open to the public, and (3) To use Don's word, please avoid any activity that could be considered "proselytizing" while on duty as the Chief of Police.

After receiving Maynard's April 30, 2012 letter, Hutton states he voluntarily offered to quit preaching, noting that "[w]hen [Maynard] gave me the letter I told him, I said, 'Well, I'll just quit preaching right now,' but that Maynard responded by telling him 'Well, you don't have to do that.'"  Hutton Depo. at 55.  In this respect, Maynard doesn't "think that being a preacher and being a police chief go together" as far as performing the duties of police chief.  Maynard Depo. at 12.  Rather, Maynard states that "as a police chief, you need to be a chief and uphold the law and make the arrests the way that they should.  If you're going to preach, then preach, but don't try to preach to them and

witness to them when you're trying to arrest them." Maynard Depo. at 13.[2] Hutton does not dispute that he was not entitled to preach while on duty as police chief. Pl.'s Resp. to Def.s' St. of Undisp. Mat. Facts, ¶ 10 [doc.#34].

As Chief of Police, Hutton was responsible for making sure that officers under his command were trained properly and up-to-date on their certifications. Hutton Depo. at 19-20. At the time of his termination, Hutton's officers were not up-to-date on their firearms certifications and had not been firearms qualified for over two years, from June 2010 to September of 2012. Hutton Dep. at 20, 25. Hutton claims this was because there was a shortage of ammunition. Hutton Depo. at 20. City Council member Nutz states that it was possible for Hutton to obtain ammunition during this period, Nuntz Depo. at 23, while City Council member Baker states that as an employee of Remington Arms, she was aware of a general shortage of ammunition in the United States between 2010 and 2012 but that it wasn't mentioned to her in a City Council meeting. Baker Depo. at 7-8. Baker states that if Hutton had made the City Council aware of his officers' lack of firearm certification then the City Council would have ensured funds were available for the purchase of ammunition. Baker Depo. at 24, 26. For his part, Maynard states the ammunition issue was not ever a consideration for him and that he didn't know there was

---

[2] On August 2, 2010, Hutton recorded himself as police chief responding to a report of child abuse. After taking the mother and child involved in the call to the police station, Hutton told them, "One of the things you both need to do is get up on Sunday morning and go to church." After the mother indicated she could not attend church because of her lack of opportunity, Hutton responded, "Well you've got a church within walking distance, it's called the First Baptist Church of England." Def.s' Ex. J.

an ammunition issue until the day he was deposed on May 20, 2014.  Maynard Depo. at 77-78.

It was also Hutton's duty to make sure the department's canine was certified. Hutton Depo. at 21.  At the time of his termination, the canine was not certified.  Hutton Depo. at 21.  Hutton states that "the officer [in charge of the canine unit] and I had that discussion [about the canine certification] and he was about to be disciplined when I was fired."  Hutton Depo. at 21.  Hutton states there were several issues with rescheduling the certification of the canine unit, including that the canine officer "had missed several training sessions because of some family stuff."  Hutton Depo. at 84.  Hutton states he couldn't recount "exactly every issue that was there, but I know that we had trouble getting him to that training."  Hutton Depo. at 84.  In his affidavit, Hutton states that "[w]ith regard to ensuring that the canine unit was certified, Maynard, along with the rest of the City Council were aware of the fact that the canine unit was extremely ill making the animal incapable of being certified."  Hutton Aff. ¶ 22.  Maynard acknowledges that the "dog had gotten in bad health" and that was "[p]ossibly" one of the reasons why the training kept on being delayed.  Maynard Depo. at 77-78.  The canine had not been certified for some six months at the time Hutton was terminated.  Hutton Depo. at 21.

Maynard received complaints about the job performance of Hutton and the police department from Janice Campbell, the Director of the Housing Authority.  Hutton Depo. at 63.  Among other things, Campbell claimed that a crime occurred at the Housing Authority and that no officer responded.  Hutton Depo. at 64.  Hutton acknowledges he

can neither prove nor disprove Campbell's claim, stating it's "like trying to prove a negative."  Hutton Depo. at 64.  Hutton also acknowledges that Campbell's claims could "shake [his] boss' faith perhaps in [his] ability to lead the police department."  Hutton Depo. at 64.

The owner of Downtown Motors, Larry Pettit, also complained about Hutton, claiming that one of Hutton's officers targeted his employee and gave the employee a ticket.  Hutton Depo. at 64-65.  Hutton, who noted that his department had arrested several of Pettit's employees, states that after looking at the targeting claim, he determined that the ticket was for a legitimate traffic stop.  Hutton Depo. at 65.

At some point, Hutton became aware of a dent to the left front fender of the new Tahoe he was driving.  Hutton Depo. at 59.  Hutton reported the dent to Maynard or Susan Pitts, Maynard's assistant, and was asked to get the Tahoe repaired.  Hutton Depo. at 59.  Hutton did not get the Tahoe repaired "right away" and does not "remember if we got it over to the body shop to get that dent taken out or not."  Hutton Depo. at 59-60.

Pursuant to a federal grant, Hutton purchased video cameras for the police units but was instructed by Maynard that he must stay within the monetary limits of the grant because of the City's funding.  Hutton Depo. at 55.  Hutton exceeded the grant limit by some $4,000 because he didn't account for certain charges, including taxes.  Hutton Depo. at 56.  In this respect, Hutton states he had to do away with one camera to fit inside the budget and was instructed to return one camera to the vendor.  Hutton Depo. at 56.  Hutton did not return the camera, however, stating that "we were having problems with

two of the cameras that were in the vehicles and I held onto that camera until we got that ironed out with the company." Hutton Depo. at 56. Hutton does not know if the camera issue is "all worked out" as he "left before that was done." Hutton Dep. at 59. Maynard states "there were probably five times that [Hutton] was asked if the camera had been sent back" but it had not and that the camera issue "was the straw that broke the camel's back" in his decision to terminate Hutton. Maynard Depo. at 29, 77.

Hutton states he informed Maynard that he wanted to promote an African-American, Brenda Parks, and that Maynard said, "You do whatever you think is right, Chief." Hutton Depo. at 33. Hutton states he was terminated the following day and that immediately thereafter, "they did away with that position so she wouldn't be put into it" although "she was later reinstated to that position when they made it again." Hutton Depo. at 33. Hutton acknowledges that Parks is the head dispatcher and that she wasn't fired. Hutton Depo. at 34.

Hutton appealed Maynard's termination of him as Chief of Police to the City Council and asked that he be reinstated. The City Council held a meeting on the issue at which Hutton never mentioned that his promotion of Parks or his preaching off duty had anything to do with his termination. Hutton Depo. at 38. Apparently, either a motion was made by City Council member Givens to reinstate Hutton but the motion died for lack of a second or a vote was taken by the full City Council on whether to reinstate Hutton and only Givens voted in favor of reinstating Hutton. Maynard Depo. at 43; Hutton Depo. at

67.[3]

City Council member Baker states that the City Council went into executive session and that based on the accusations of Maynard, including the certification issues and that Hutton "basically was neglecting his duties," she felt she had no choice to vote not to reinstate him.  Baker Depo. at 6.  Baker later opined that maybe things weren't as bad as Maynard portrayed them to be, that maybe she and the City Council were misled by Maynard, and that Hutton was not treated fairly by Maynard.  Baker Depo. at 19.  Baker notes, however, that she did not recall any religious issues coming up in the executive session and she was not aware–and Maynard did not mention–that Hutton was seeking to promote an African-American.  Baker Depo. at 16, 19.

City Council member Givens notes that during executive session, the allegation that Hutton was not doing his job, including the camera and certification issues, were discussed.  Givens Depo. at 11.  Givens notes that this information was coming from Maynard but she was concerned that there was no paperwork to back up what Maynard was saying about Hutton.  Givens Depo. at 11-12.  For this reason, she states she voted to reinstate Hutton but was the only council member to do so.  Givens Depo. at 17-19.[4]

---

[3] Maynard states a motion to reinstate Hutton was made but died for lack of a second. Maynard Depo. at 43.  Givens states that only she voted to reinstate Hutton and that she never made a motion to do so.  Givens Depo. at 17.  Hutton states no vote was taken by the City Council on his request to be reinstated.  Hutton Depo. at 69.

[4] City Council member Newton recalls that City Council Baker also voted to reinstate Hutton.  Newton Depo. at 21.  As previously noted, however, Baker states she voted not to reinstate Hutton, although she states she came to later regret that vote.  Baker Depo. at 6, 9.

Givens notes that she never witnessed Hutton preaching on a street corner, no one ever told her he was witnessing to prisoners or people who had been arrested, and she was unaware that Hutton was attempting to promote an African-American.  Givens Depo. at 19-20.[5]

City Council member Nutz also mentioned that the certification issues and that "our crime reporting was behind" were discussed in the executive session, and he notes that "[o]bviously I already knew our officer morale was down."  Nutz Depo. at 21-22.[6]

City Council members Douglas and Adams state that they were not aware that Hutton was attempting to promote an African-American the day before he was terminated.  Douglas Depo. at 21; Adams Depo. at 20.

City Council member Newton notes that during the executive session, other council members asked questions of Maynard concerning the reasons he thought Hutton should be terminated, including, "to the best of [his] knowledge, the grant deal, and some of the officers not being certified in the right ways.  But it was very well brought out, I feel, that when a person works for another person ... when your superior tells you to do something, you should do it.  And that's a good case of insubordination ... [a]nd it comes to a point that I feel like the person in charge must do what he must do."  Newton Depo. at 22.

---

[5] Hutton is not alleging in this action that he was entitled as a police officer to witness to arrestees.  Hutton Depo. at 18-19.

[6] Hutton acknowledges that morale was low in the police department in 2012 and that it was his problem.  Hutton Depo. at 19.

II.

Defendants move for summary judgment on the following grounds: (1) Hutton cannot make out a prima facie case of race retaliation; (2) Hutton cannot make a prima facie case of religious retaliation; (3) Hutton cannot make out a prima facie case of age discrimination; (4) the City Council members are entitled to legislative immunity and in any case took no action that would give rise to a claim; (5) the City Council members and Maynard are entitled to qualified immunity; (6) Hutton has failed to establish municipal liability on his constitutional claims; and (7) Hutton cannot establish he was wrongfully discharged under Arkansas law.

A.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," or show "that the materials cited do not establish the absence or presence of a genuine dispute," or "that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed.R.Civ.P. 56(c)(3). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986) (citations omitted). Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation and quotation marks omitted).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id*.

## B.

### 1.

As a preliminary matter, Hutton acknowledges that he is unable to show evidence of age discrimination and that defendants' motion for summary judgment on his ADEA claim should be granted.  Accordingly, the Court grants defendants' motion for summary judgment on Hutton's ADEA claim.

### 2.

In addition, although Hutton states in his Equal Employment Opportunity Commission (EEOC) charge of discrimination that he was discharged because of his race (white), Hutton acknowledges in his deposition that he is not claiming that his own race played a role in his termination.  Hutton Depo. at 52.  Accordingly, the Court dismisses any claim Hutton is making that he was discharged because of his race.

### C.

The Court now turns to Hutton's retaliation claims.[7]  As previously noted, Hutton claims he was terminated as Chief of Police in retaliation for desiring to promote an African-American and in retaliation for preaching off duty as an ordained Baptist minister.[8]

In retaliation cases, the claimant may either offer direct evidence of retaliation or satisfy the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*,

---

[7] Hutton's complaint is imprecise on many levels and it is questionable whether it can be construed as asserting retaliation claims.  Notably, Hutton's EEOC charge does not check the box for retaliation and his complaint does not once mention the word "retaliation" but rather reads more like his EEOC charge in which he claims he believes he "was discharged because of my race (White) and religion (Christian) in violation of Title VII ... and because of my age ...."  Nevertheless, defendants do not question that Hutton asserts retaliation claims and the Court, for purposes of full appellate review, will address the merits of any such claims.

[8] With respect to Hutton's claim of retaliation for his desire to promote an African-American, Hutton only argues that he has established that claim under Title VII, thereby waiving any other grounds for such a retaliation claim.  See *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) ("failure to oppose a basis for summary judgment constitutes a waiver of that argument"); *Hughes v. City of Indianapolis*, 2012 WL 1682032, *1 n.1 (S.D. Ind. 2012) (dismissing certain claims of plaintiff where plaintiff failed to address arguments made by defendant "or otherwise present evidence to support her allegations").  Title VII, however, requires that before a plaintiff can bring suit in court to allege unlawful discrimination, he or she must file a timely charge with the EEOC or a state or local agency with authority to seek relief.  *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir. 2012) (per curiam) (citations omitted).  As previously noted, Hutton's EEOC charge does not check the box for retaliation and his charge cannot otherwise reasonably be construed as asserting a retaliation claim.  Accordingly, it does not appear that Hutton exhausted his administrative remedies as to his Title VII claim of retaliation for his desire to promote an African-American.  See *id*. at 851-52 (noting that retaliation claims are not reasonably related to underlying discrimination claims and that each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice for which a separate charge is required).  However, as defendants do not address the issue of exhaustion, the Court will not use failure to exhaust as a basis for dismissing Hutton's Title VII retaliation claim.  See *Shempert v. Harwick Chem. Corp*., 151 F.3d 793, 797 (8th Cir. 1998) (exhaustion under Title VII is a requirement subject to waiver, estoppel, and equitable tolling).

411 U.S. 792 (1973).  See *Lors v. Dean*, 746 F.3d 857, 865 (8th Cir. 2014).[9]  "Direct

evidence is evidence showing a specific link between the alleged discriminatory animus

and the challenged decision, sufficient to support a finding by a reasonable fact finder that

an illegitimate criterion actually motivated the adverse employment action."  *Moody v.

Vozel*, 771 F.3d 1093, 1096 (8th Cir. 2014) (internal quotation marks and citation

omitted).  "Direct evidence of discrimination must relate to people with decision-making

authority."  *Id*.  "[S]tray remarks in the workplace, statements by nondecisionmakers, and

statements by decisionmakers unrelated to the decisional process do not constitute direct

evidence."  *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961,

966 (8th Cir. 2006) (citation and internal quotation marks omitted).

     Hutton purports to have direct evidence of retaliation.  Concerning his claim that

he was discharged in retaliation for desiring to promote an African-American, Hutton

argues that Maynard and Maynard's friends, including Darrell Henderson and City

Council member Adams, openly displayed a racially discriminatory animus towards

African-American citizens of the City when they referred to African-Americans with

terms such as "those people," "them people," and "the people from the other side of the

tracks."  Hutton further argues that while in the presence of Hutton and Maynard,

Henderson specifically referenced African-Americans using the term "nigger" and that

---

[9] The *McDonnell Douglas* burden-shifting framework applies to retaliation claims under Title VII, § 1981, and § 1983.  *Ellis v. Houston*, 742 F.3d 307, 319 (8th Cir. 2014).  See also *Hughes v. Sottlemyre*, 506 F.3d 675, 678 (8th Cir. 2007) (applying *McDonnell Douglas* burden-shifting framework to case of retaliation based on the First Amendment).

Maynard "took no offense to the use of such a term to describe the African-American citizens of his town."

That Maynard and his friends allegedly referred to African-Americans with terms such as "those people," "them people," and "the people from the other side of the tracks," does not constitute direct evidence of a racially discriminatory animus towards African-Americans as Hutton provides no context or time frame in which these remarks were allegedly made and he has not demonstrated a specific link between the alleged remarks and his termination.  And even if Henderson used the deplorable term "nigger" to describe African-Americans, Henderson was not a decision-maker and Hutton presents no specific link between Henderson's use of that term and Maynard's decision to terminate his employment.  Hutton's claim that Maynard "took no offense to the use of such a term" is much too subjective an interpretation of Maynard's mind set to constitute direct evidence of racially discriminatory animus on Maynard's part.

Concerning his claim that he was terminated in retaliation for preaching off duty as an ordained Baptist minister, Hutton argues that Maynard's April 30, 2012 letter accusing him of "proselytizing," which he states was "made within the context of Maynard's own objections to people serving as both police chief while on duty and ministers off duty," constitutes direct evidence of retaliation.  The Court disagrees that this letter is direct evidence of retaliation as Maynard's letter only asked that Hutton not proselytize while on duty and Maynard only stated that he didn't "think that being a preacher and being a police chief go together" as far as performing the duties of police chief.  Maynard did not

-14-

object to people "serving as both police chief while on duty and ministers off duty."  As previously noted, Hutton does not dispute that he was not entitled to preach while on duty as police chief.

1.

The Court now turns to the substance of Hutton's retaliation claims, beginning with Hutton's claim that he was terminated in retaliation for seeking to promote an African-American, which he terms "associational race discrimination."  Hutton states that "[t]he bases [sic] for Hutton's associational race discrimination claim come from the racially discriminatory animus Maynard and Maynard's associates openly displayed toward African-Americans," including Maynard and Maynard's friends allegedly referring to African-Americans with terms such as "those people," "them people," and "the people from the other side of the tracks," and Henderson allegedly referring to African-Americans as "niggers" with Maynard taking no offense to the use of such a term.

Having failed to produce direct evidence of associational race retaliation, Hutton must first establish a prima facie case of such retaliation by proving (1) he engaged in statutorily protected conduct, (2) he suffered an adverse employment action, and (3) a causal connection exists between the two.  *Fiero v. CSG Systems, Inc.*, 759 F.3d 874, 880 (8th Cir. 2014) (citations and quotation marks omitted).  If Hutton establishes a prima facie case, defendants must then rebut it by presenting evidence of a legitimate, non-retaliatory reason for the action it took against Hutton.  *Id*.  If defendants satisfy this

-15-

burden, Hutton is then obliged to present evidence that (1) creates a question of fact as to whether defendants' proffered reason was pretextual and (2) creates a reasonable inference that defendants acted in retaliation. *Id*.

The Court will assume without deciding that Hutton engaged in statutorily protected conduct in associating with and seeking to promote an African-American. *Cf. Johnson v. University of Cincinnati*, 215 F.3d 561, 574 (6th Cir. 2000) ("[I]n order to state a cognizable claim under Title VII, the plaintiff himself need not be a member of a recognized protected class; he need only allege that he was discriminated on the basis of his association with a member of a recognized protected class."); *Chandler v. Fast Lane, Inc.*, 868 F.Supp. 1138, 1143-44 (E.D. Ark. 1994) (white former employee who alleged that, while she was manager of employer's restaurant, employer thwarted her efforts to employ and promote African-American employees and that, as result, conditions of her employment became so intolerable that she was forced to resign, stated Title VII claim against employer). There also is no question that Hutton suffered an adverse employment action, having been terminated as Chief of Police for the City.

The Court finds, however, that Hutton has not shown that a causal connection exists between his termination and his association with and desire to promote an African-American. "To establish causation, [Hutton] must prove 'the desire to retaliate was the but for cause of' [his] termination–that is, 'that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the [defendants].'" *Wright v. St. Vincent Health System*, 730 F.3d 732, 737 (8th Cir. 2013) (quoting *Univ. of*

*Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. —, —, 133 S.Ct. 2517, 2528 (2013)).  See also

*Musolf v. J.C. Penny Company, Inc.*, — F.3d —, 2014 WL 6845105, *3 (8th Cir. Dec. 5,

2014) (noting that the Supreme Court in *Nassar* "recently held retaliation claims brought

under Title VII must be proved according to traditional principles of but-for causation.").

As evidence of causation, Hutton claims he has "comparators for purposes of

special treatment," namely "other department heads working for the City of England who

were not terminated or disciplined for engaging in religious activities or for being

associated with an African-American."  Hutton states that "[s]uch employees of the City

of England include Shannon Hollis, Diana Watkins, Nathan Cook, and Susan Pitts,"[10] and

he states that "[t]o [his] knowledge, neither Hollis, Watkins, Cook, nor Pitts were ever

subjected to discrimination based upon their religious beliefs and practices or for

associating with an African-American."

Applying a "low-threshold standard" in determining whether the comparator

employees are similarly situated for purposes of Hutton's prima facie case, see *Wimbley*

*v. Cashion*, 588 F.3d 959, 962 (8th Cir. 2009), the Court finds that Hutton's comparator

evidence falls well short of supporting causation.  Hutton provides no context for the

comparators he identifies, including the African-Americans they associated with, the

departments in which they worked, or the applicable time frames.  Merely stating that

"[t]o [his] knowledge," neither of the individuals mentioned as comparators "were ever

---

[10] As previously noted, Susan Pitts is not a department head but is Maynard's assistant.

subjected to discrimination ... for associating with an African-American" in no way

satisfies Hutton's prima facie case.

It is true that the timing of an adverse employment action in connection with the

protected activity can sometimes establish causation for purpose of establishing a prima

facie case. *Green v. Franklin Nat. Bank of Minneapolis*, 459 F.3d 903, 915 (8th Cir. 2006)

(citation and quotation marks omitted).  As previously noted, Hutton states he was

discharged one day after he informed Maynard that he wanted to promote an African-

American.  Although such a close proximity might otherwise raise an inference of a

causal connection, the Court does not so infer in this action as Hutton only offers flawed

comparator evidence in support of his claim and he acknowledges he "can't explain" why

the City would have promoted Parks if they fired him for doing so.  Hutton Depo. at 52.[11]

Even if Hutton established a causal connection between his termination and his

desire to promote an African-American, he has not demonstrated that the reasons given

for his termination were pretextual.  To prove pretext, Hutton must both discredit

defendants' asserted reasons for his termination and show that the circumstances permit

drawing a reasonable inference that the real reason for his termination was retaliation.

*Gilbert v. Des Moines Area Community College*, 495 F.3d 906, 918 (8th Cir. 2007)

(citation omitted).  Temporal proximity alone is insufficient to show a pretextual motive

---

[11] Defendants note that "Hutton is left in the position of showing that the Mayor is racist against African-Americans, but terminated a Caucasian employee and has promoted an African-American employee."

rebutting a legitimate, non-discriminatory reason for an adverse employment action. *Green,* 459 F.3d at 916 (citation omitted).

Hutton essentially argues that the reasons given for his termination, including failure to make sure officers were up to date on their firearms certifications, failure to make sure the canine was certified, exceeding the federal grant for the cameras, and the complaints of Campbell about Hutton and his department's job performance, were false and shifting explanations. Certainly, the Court will discount the canine certification issue as Maynard acknowledges that the "dog had gotten in bad health" and that was "[p]ossibly" one of the reasons why the training kept on being delayed.

Concerning the firearms certification issue, however, Hutton does not dispute that his officers weren't firearms certified and he does not dispute Maynard's claim that he wasn't aware of the alleged shortage of ammunition–the reason his officers weren't firearms certified, states Hutton–until the day he was deposed (long after Hutton's termination) and that the ammunition issue was not ever a consideration for him. But even discounting the firearms certification issue, Hutton does not seriously dispute that he exceeded the federal grant for the purchase of cameras and did not return a camera when instructed to do so, that he did not repair the dent to the fender of the new Tahoe he was driving when instructed to do so, and that there were complaints about his job performance, including from Campbell, which Hutton acknowledges he can not disprove and which could "shake [his] boss' faith perhaps in [his] ability to lead the police department." These were legitimate, non-discriminatory reasons for Hutton's termination

and Hutton has not provided sufficient evidence of retaliation to create a genuine issue for trial about "whether the employer acted based on an intent to retaliate rather than on a good faith belief that the employee violated a workplace rule." *McCullough v. Univ. of Ark. for Med. Sciences*, 559 F.3d 855, 864 (8th Cir. 2009) (citation omitted).[12]

Whatever post-decision regrets City Council member Baker may have had about not reinstating Hutton, and even if she felt misled about Hutton's alleged shortcomings, Baker does not specify how she was misled, and even discounting the certification issues, neither she nor City Council Member Givens, who voted to reinstate Hutton, do not dispute Hutton's failure to return the camera, to get the Tahoe repaired as instructed, and that there were complaints about Hutton's job performance. "Courts do not sit as super-personnel departments to second-guess the business decisions of employers. The threshold question when considering pretext is whether [defendants'] reasons for its employment actions are true, not if they are wise, fair or correct." *Dorsey v. Pinnacle Automation Co,*, 278 F.3d 830, 837 (8th Cir. 2002) (internal citation omitted). As previously noted, City Council Member Newton noted that "when a person works for another person ... when your superior tells you to do something, you should do it. And that's a good case of insubordination ... [a]nd it comes to a point that I feel like the person

---

[12] Of course, as Hutton's comparator evidence does not satisfy the low-threshold standard in determining whether the comparator employees are similarly situated for purposes of his prima facie case, it follows that such evidence also does not satisfy the rigorous test at the pretext stage. See *Fiero*, 759 F.3d at 879 (noting that at the pretext stage of the *McDonnell Douglas* burden-shifting framework, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one).

in charge must do what he must do."  There simply is no indication that the reasons given for terminating Hutton were pretextual and that Hutton's desire to promote an African-American was the but for cause of his termination.[13]

2.

The Court now turns to Hutton's § 1983 claim that he was terminated in retaliation for his preaching off duty as an ordained Baptist minister.  Having failed to produce direct evidence of religious retaliation, Hutton must first establish a prima facie case of such retaliation by proving (1) he engaged in conduct protected by the First Amendment, (2) the defendants took an adverse employment action against him, and (3) the protected conduct was a substantial or motivating factor in the defendants' decision to take the adverse employment action.  *Skalsky v. Independent School District No. 743*, 772 F.3d 1126, 1129-30 (8th Cir. 2014) (citation and quotation marks omitted).  If Hutton meets this burden, the burden shifts to the defendants to demonstrate that the same employment action would have been taken in the absence of the protected activity.  *Id.* at 1130; see

---

[13] It is not clear if Hutton is asserting a claim of associational race discrimination separate from his claim that he was terminated in retaliation for seeking to promote an African-American. For example, in Paragraph 3 of Hutton's response [doc.#35] to defendants' motion for summary judgment, Hutton states as follows: "Defendants next argue that Hutton cannot make out a claim for associational race discrimination **or** retaliation.  Hutton has made out a prima facie case of **such** retaliation and has shown that the false and shifting reasons given for terminating Hutton are evidence of pretext for **such** retaliation.  Further, Hutton has shown that there was racially discriminatory animus present during his termination.  For these reasons, Defendants' Motion for Summary Judgment based upon Hutton's purported failure to make out a claim for associational race discrimination **or** retaliation should be denied." (Emphasis added.)  To the extent Hutton is asserting a claim of associational race discrimination separate from his retaliation claim, such claim fails as Hutton has failed to show that defendants' legitimate, nondiscriminatory reasons for his termination were a pretext for associational race discrimination.

also *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977) ("Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor' or to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct." (footnote omitted)).  Whether protected conduct was a substantial or motivating factor in an employment decision is a question of fact.  *Skalsky*, 772 F.3d at 1130 (citation and quotation marks omitted).  The sufficiency of the evidence to create an issue of fact for the jury, however, is solely a question of law.  *Id*.

The Court assumes for purposes of today's decision that Hutton engaged in conduct protected by the First Amendment.  And, as previously noted, there also is no question that defendants took an adverse employment action against Hutton.  Hutton has not shown, however, that the protected conduct was a substantial or motivating factor in the decision to take the adverse employment action against him.

In support of his First Amendment retaliation claim, Hutton relies on the same evidence he relied on in support of his Title VII associational race retaliation claim.  For the same reasons his evidence failed with respect to his Title VII retaliation claim, that same evidence fails with respect to his First Amendment retaliation claim.  Hutton's comparator evidence is flawed for the reasons previously stated–Hutton provides no

context for the comparators he identifies, including what their religious beliefs and practices were (*e.g.*, Baptist? Catholic?), the departments in which they worked, or the applicable time frames.  In addition, Hutton does not dispute that he exceeded the federal grant for the purchase of cameras and did not return a camera when instructed to do so, that he did not repair the dent to the fender of the new Tahoe he was driving when instructed to do so, and that there were complaints about his job performance, including from Campbell, which Hutton acknowledges he can not disprove and which could "shake [his] boss' faith perhaps in [his] ability to lead the police department."  Moreover, Hutton acknowledges that he preached for some three years prior to his termination and that "[t]he Mayor and city council all knew and respected the Plaintiff for his religious beliefs and, at no time, asked him to cease working as a minister on his off days."  The Court finds that no reasonable jury could conclude that Hutton's evidence is sufficient to show his religious activities were a substantial or motivating factor in the decision to terminate his employment as Chief of Police, and the Court finds also that the same decision as to Hutton's employment as Chief of Police would have been reached even in the absence of the protected conduct.[14]

## D.

Given that Hutton's retaliation (and, if asserted, associational race and religious

---

[14] To the extent Hutton is asserting a claim of religious discrimination separate from his retaliation claim, such claim fails as Hutton has failed to show that the  legitimate, nondiscriminatory reasons for his termination were a pretext for religious discrimination.

discrimination) claims are without merit, Hutton has not established municipal liability as he has not shown that his constitutional rights were violated by an "action pursuant to official municipal policy" or misconduct so pervasive among non-policymaking employees of the municipality "as to constitute a 'custom or usage' with the force of law." *Ware v. Jackson County, Mo.*, 150 F.3d 873, 880 (8th Cir. 1998) (quoting *Monell v. Dept. of Social Serv.*, 436 U.S. 658, 691 (1978)).[15]

### E.

As for Hutton's state law wrongful discharge claim, the United States Court of Appeals for the Eighth Circuit has held that when federal and state claims are joined and all federal claims are dismissed on a motion for summary judgment, the state claims are ordinarily dismissed without prejudice to avoid needless decisions of state law as a matter of comity. *American Civil Liberties Union v. City of Florissant*, 186 F.3d 1095, 1098-99 (8th Cir. 1999) (citation and quotation marks omitted). See also *Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 749 (8th Cir. 2009) ("[i]t is within the district court's discretion to exercise supplemental jurisdiction after dismissal of the federal claim" but "[w]here, as here, resolution of the remaining claims depends solely on a determination of state law, the Court should decline to exercise jurisdiction."); *Figg v. Russell*, 433 F.3d 593, 600 (8th Cir. 2006) (noting that when district court dismissed federal 42 U.S.C. §

---

[15] Because Hutton's federal claims are without merit, the Court need not address defendants' claims that Maynard and the City Council members are entitled to qualified and legislative immunity.

1983 action, it should have exercised its discretion to dismiss state-law claims without prejudice, leaving it to plaintiff to determine whether to reassert them in state court). Accordingly, the Court dismisses without prejudice Hutton's state law claim of wrongful discharge.

III.

For the foregoing reasons, the Court grants the motion [doc.#24] of Danny Maynard, Jr., Lenny Abrams, Peggy Baker, Rick Douglas, Dearl Frizzell, Mary Givens, Bill Newton, Jeremy Nutz, Dudly Webb, Jr., and the City of England, Arkansas, for summary judgment on plaintiff Herman L. Hutton's federal claims and dismisses Hutton's state law claim of wrongful discharge without prejudice.  The Court will enter judgment accordingly.

IT IS SO ORDERED this 8th day of January 2015.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE